**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Anthony J. Patek (State Bar No. 228964)
  anthony@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORAINE MCWHORTER AND SAMEER SHARMA, INDIVIDUALS, ON BEHALF OF THEMSELVES, THE GENERAL PUBLIC, AND THOSE SIMILARLY SITUATED,<br><br>                              Plaintiffs,<br><br>      v.<br><br>THE PROCTER & GAMBLE COMPANY,<br><br>                              Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR FRAUD, DECEIT, AND/OR MISREPRESENTATION; VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT; FALSE ADVERTISING; NEGLIGENT MISREPRESENTATION; AND UNFAIR, UNLAWFUL, AND DECEPTIVE TRADE PRACTICES<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1. Plaintiffs Loraine McWhorter and Sameer Sharma, by and through their counsel, bring this Class Action Complaint against The Procter & Gamble Company (referred to as "Defendant" or "P&G"), on behalf of themselves, and those similarly situated, for fraud, deceit, and/or misrepresentation; violation of the Consumer Legal Remedies Act; false advertising; negligent misrepresentation; unfair, unlawful, and deceptive trade practices, and unjust enrichment. The following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

2. This case concerns P&G's Herbal Essences and Pantene shampoos and conditioners, which Defendant sells using the false claim that they are comprised of specific proportions of "natural-origin ingredients" (e.g., "90% Natural-Origin ingredients") or "naturally-

derived ingredients (e.g., "97% Naturally Derived Ingredients"). The products include, but are not limited to, P&G's Herbal Essences Shampoo (in at least six different scents), Herbal Essences Conditioner (in at least six different scents), Pantene "Essential Botanicals" Shampoo (in at least four different scents), and Pantene "Essential Botanicals" Conditioner (in at least four different scents) (collectively, "the Products").

3.     Defendant affirmatively represents that the Products have "X% Natural Origin Ingredients" (e.g., "90% Natural-Origin" for the Herbal Essences Argan Oil Repair Conditioner) or "X% Naturally Derived Ingredients" (e.g., "97% Naturally Derived Ingredients" for Pantene Sulfate-Free Volumizing Conditioner). Defendant makes this claim on both the front and back labels of the Products' packaging. Defendant also represents to consumers that the Products are "X% naturally derived ingredients" on its website and related third-party retail websites. However, Defendant's representation regarding the Products is false and/or misleading.

4.     Defendant's labeling suggests to reasonable consumers nationwide that X% or more (generally, ≥ 90%) of the ingredients in the Products originate in nature and/or are "natural."

5.     In truth, once water is excluded, over 90% of the ingredients in the Products are not natural and do not originate in nature; rather, they are of industrial-origin. Even with water included, the Products do not contain the advertised number or mass of natural ingredients. Many of the exact same ingredients are used in other hair products that are not—and never have been—considered "natural-origin." Even when these compounds can occur in nature (e.g., citric acid), they are not generally available from natural sources on the scale required for use in mass-produced products and instead created through industrial chemical processes for use in the Products. As such, the "% Natural Origin" and "% Naturally-Derived" claims are false.

6.     P&G's practice is also inherently deceptive and misleading. Based on Plaintiff's investigation, P&G is labeling the Products as X% Natural-Origin" or "X% Naturally Derived" ingredients based on its use of the proprietary standard ISO 16128 developed by the British Standards Institute. That standard uses a Byzantine method to calculate "natural origin" and "% natural-origin" in which one compares the mass of the atoms that were in a "natural" starting material to the total mass in an industrially-produced chemical made from that starting material

to calculate the "% natural-origin" and/or "% naturally-derived." By doing this, the manufacturer is able to gaslight consumers by characterizing synthetic chemicals as "naturally derived" or "natural origin."

7.    Even if an average consumer could obtain the ISO 16128 standard (by paying fees of over $400 to the British Standards Institute), they would not understand it, because it is complicated and written for chemists. Indeed, the British Standard Institute acknowledged as much in the ISO 16128 publications, stating "Neither ISO 16128-1 nor this document [i.e., ISO 16128-2] addresses product communication (e.g. claims and labelling), . . . characteristics of packaging materials or regulatory requirements applicable for cosmetics." In other words, the BSI states in the standard that it is not intended for use in product labeling and product communications. Despite this clear instruction not to use the standard for labeling claims or advertisements, Defendant has deceptively chosen to do so.

8.    Plaintiffs purchased the Products believing they were purchasing hair care products made predominantly of ingredients derived directly from natural sources, like aloe. Plaintiffs purchased the hair care products with "X% natural-origin"/"naturally-derived ingredients" believing that the "natural-origin"/"naturally derived ingredients" made the products better for the environment, safer, and better for their hair than products comprised of synthetic, industrially-produced chemicals.

9.    Defendant's marketing and advertising intentionally misled and deceived Plaintiffs to believe that the Products were comprised of specific high proportions of ingredient directly derived from or originating in natural sources (e.g., extracted directly from plants) and had the attendant perceived benefits of natural ingredients.

10.    Defendant's marketing and advertising representations and omissions concerning the Products were false and misleading, were directed at inducing, and did induce, Plaintiffs and Class Members to purchase the Products when they would not have otherwise, or at higher prices than they would otherwise have paid, had they known the truth of the matter.

11.    Defendant knew that the Products it sold were not comprised of the advertised proportions of natural-origin/naturally derived ingredients, and that its advertising materials were

false and deceptive in describing the Products as comprising the advertised proportions of natural-origin/naturally derived ingredients.

12.     Despite knowing that its advertisements falsely and deceptively stated that the Products were made of "X% natural-origin/naturally derived ingredients," Defendant refused and failed to change the labels, remove the false representations, or otherwise inform Plaintiffs, those similarly situated and/or the general public of the Products true composition with respect to natural-origin ingredients.

## PARTIES

13.     Plaintiff Loraine McWhorter is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Bethel Island in Contra Costa County, California. Ms. McWhorter intends to remain in Bethel Island and makes her permanent home there.

14.     Plaintiff Sameer Sharma is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Hayward in Alameda County, California. Mr. Sameer intends to remain in Hayward and makes his permanent home there.

15.     Defendant The Procter & Gamble Company is a Limited Liability Company formed under the laws of the state of Delaware, having its principal place of business in Cincinnati, Ohio.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

17.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California, and is a resident of California with its principal place of business within the State of California.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

19.     In accordance with California Civil Code Section 1780(d), Ms. McWhorter concurrently files herewith a declaration establishing that she purchased P&G's Herbal Essences hair care product in Contra Costa, California in November of 2022. (Ms. McWhorter's declaration is attached hereto as Appendix A.)

20.     In accordance with California Civil Code Section 1780(d), Mr. Sharma concurrently files herewith a declaration establishing that he purchased P&G's Pantene hair care product in Hayward, California in November of 2023. (Mr. Sharma's declaration is attached hereto as Appendix A.)

21.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### The Market for Natural Beauty Products

22.     The market for "natural" beauty products, including hair care, skin care and cosmetics, is large and growing. See, e.g., Soyoung Kim and Yoo-Kyoung Seock, IMPACT OF HEALTH AND ENVIRONMENTAL CONSCIOUSNESS ON YOUNG FEMALE CONSUMERS' ATTITUDE TOWARDS AND PURCHASES OF NATURAL BEAUTY PRODUCTS, Int. J. Consumer Studies, 33:627-238 (2009) (reporting global sales of $7B for "natural" beauty products in 2007, with expected growth rate of ~9% per year). Surveys of consumers in the United States and Europe show consistent demand for "natural" products, including those with natural ingredients. See, e.g., Seyoung Kim, IMPACT OF HEALTH AND ENVIRONMENTAL CONSCIOUSNESS ON YOUNG FEMALE CONSUMERS' ATTITUDE TOWARDS AND PURCHASES OF NATURAL BEAUTY PRODUCTS, Int. J. Consumer Studies, 33:627-238 (2009); Nora Amberg and Csaba Fogarassy, GREEN CONSUMER BEHAVIOR IN THE COSMETICS MARKET, Resources, 8:137 (2009) ("Currently, marketing trends are turning towards natural solutions for cosmetics. . . ."); Nora Amberg, APPEARANCE OF NATURAL COSMETICS IN CONSUMER BEHAVIOR RELATED TO COSMETICS IN HUNGARY, Visegrad J. Bioeconomy and Sustainable Dev., Vol. 12(2) at 71-74 (2023) ("Today, the development of

healthier and more environmentally conscious lifestyle is increasing consumer perceptions and interest in natural products in particular, including cosmetics.").

23.     This desire for natural products stems from two material beliefs among consumers: (i) the belief that natural products are safer and/or better for one's body and (ii) the belief that natural products are better for the environment. See Kim, Int. J. Cons. Studies at abstract; Amberg, Resources at 2-3 (discussing association of natural cosmetics with "healthy lifestyle" and "environmental protection and sustainability questions").

24.     Studies show that these consumer preferences translate into increased purchases of "natural" products.  See Kim, Int. J. Cons. Studies at 627 (finding environmentally-conscious and health-conscious consumers were more likely to purchase "natural" products, and were willing to pay more for them); Amberg, Visegrad J. Bioeconomy and Sustainable Dev., at 72 (70% of respondents willing to pay more for a cosmetic with a natural ingredient).

25.     According to the survey data available, consumers who display these purchasing preferences, particularly environmentally-conscious consumers, place high importance on "no use of chemical ingredients." Kim, Int. J. Cons. Studies at 633; *see also id.* at 636 ("This finding is consistent with the observation made in a previous survey of UK  consumers, conducted by Organic Monitor (2007) that consumers; major concern in the purchase of natural and organic beauty products is absence of synthetic chemicals."). In this context, "chemical ingredients" means synthetic or man-made chemicals. See, e.g., Oxford Dictionary ("chemical" = "a compound or substance that has been purified or prepared, especially artificially."), available via Google.com (accessed Jan. 18, 2024); Mirriam-Webster Dictionary ("a substance obtained by a chemical process or producing a chemical effect"), available via https://www.merriam-webster.com/dictionary/chemical (accessed Jan. 18, 2024); see also Jiali Zhang and Meijuan Zhou, Factors Influencing Consumers' Purchasing Behavior in Natural Cosmetics, Univ. Uppsala Master's Thesis (2009), at 1 (defining "natural" products as those "mainly made of plant materials from agricultural-based production"; Amberg, Resources at 2-3 ("Green or natural cosmetics are made out of natural resources, without the use of chemicals, coloring additives, or other non-natural mixtures.").

26.     At the same time, consumers' ability to discern between truthful and false or deceptive claims is limited.  Jiali Zhang and Meijuan Zhou, Factors Influencing Consumers' Purchasing Behavior in Natural Cosmetics, Univ. Uppsala Master's Thesis (2009), at abstract ("Although consumers' need for a healthy and sustainable lifestyle drives natural cosmetic consumption, various claims of natural cosmetics make consumers confused and distrustful." Noting further that "lack of knowledge" and "non-harmonized certifications" led to "inconsistency between consumers' purchasing intention and actual behavior."); Kim, Int. J. Cons. Studies at 635 (finding health and environmentally-conscious consumers "did not spend more time and effort than others on comparing alternative purchase options").  In other words, while health and environmentally conscious consumers wish to purchase appropriate natural products, they do not typically look beyond label claims to ensure those claims are true, and often lack the expertise and/or information necessary to determine the veracity of the claims.

27.     Accordingly, manufacturers of beauty products are trending toward aggressively marketing their products as natural.  See Zhang at 1 (noting cosmetics companies were actively developing natural products to satisfy the "inevitable trend" to meet this demand).   These companies' advertising claims are often false or deceptive. This is true particularly for P&G, as described below.

**P&G Markets Its "Natural Origin" and "Naturally-Derived" Products to Consumers Who Prefer Natural Products**

28.     As noted above, the Products that are the subject of this Complaint are P&G's Herbal Essences and Pantene hair care products, including, without limitation, all varieties of Herbal Essences and Pantene shampoos, conditioners, and hair masks, including:

- Herbal Essences Real Botanicals Repair Argan Oil Shampoo and Conditioner

- Herbal Essences Real Botanicals Hydrate Moisture Coconut Milk Shampoo and Conditioner;

- Herbal Essences Real Botanicals Naked Volume White Grapefruit & Mint Shampoo and Conditioner;

- Herbal Essences Real Botanicals Golden Moringa Oil Shampoo and Conditioner;

- Herbal Essences Real Botanicals White Charcoal Conditioner;

- Herbal Essences Real Botanicals White Strawberry & Sweet Mint Shampoo and Conditioner;

- Herbal Essences Real Botanicals Blue Ginger & Micellar Water Shampoo and Blue Ginger Conditioner;

- Herbal Essences Real Botanicals Honey & Vitamin B Shampoo and Conditioner;

- Herbal Essences Real Botanicals Rosemary & Herb Conditioner;

- Herbal Essences Certified Pure*Plants* Coconut Oil Conditioner

- Herbal Essences Certified Pure*Plants* Argan Oil Shampoo and Conditioner

- Herbal Essences Certified Pure*Plants* Sulfate-Free Honey Shampoo and Conditioner

- Herbal Essences Certified Pure*Plants* Sulfate-Free Hemp Oil Shampoo and Conditioner

- Pantene Essential Botanicals Apricot & Shea Butter Infused Shampoo & Conditioner;

- Pantene Essential Botanicals Passion Fruit and Cocoa Butter Moisturizing Shampoo & Conditioner;

- Pantene Essential Botanicals Apple & Honeysuckle Shampoo & Conditioner; and

- Pantene Essential Botanical White Tea &. Cucumber Volumizing Shampoo & Conditioner.

29.     Each of the Herbal Essences Products contains a representation that the Product is comprised of a specific percentage of "Natural-Origin Ingredients" (e.g., "90% NATURAL-ORIGIN INGREDIENTS"). This representation is placed on both the front and back labels. It is in large, bold font on the front label, in a prominent location near the center of the front label. On the back label, it is in roughly the same size font as the rest of the back label, but emphasized by placement in a prominent table at the top of the back label, repeated in both English and French. The back label statement includes an asterisk (i.e., "% Natural Origin*"). Below the table is the following asterisk statement: "Natural source ingredients with limited processing and purified water. After processing, natural source ingredients maintain ≥50% of their natural origin material."

30.     Each of the Pantene Products contains a front label representation that the Product is comprised of a specific percentage of "naturally derived ingredients" (e.g., "96% NATURALLY DERIVED INGREDIENTS*"). The back labels for each of the Pantene Essential Botanicals Products contain an asterisk statement that "Natural source ingredients with limited processing and purified water create this 90% natural origin shampoo. After processing, natural source ingredients maintain ≥50% of their natural origin material."

31.     Each of the Products is identical in that it contains one of the two above statements (i.e., "X% Natural-Origin Ingredients" or "X% Naturally Derived Ingredients").

32.     Each of the Products buttresses the perception that it is comprised of "natural-origin" and/or "naturally-derived" ingredients by including additional references to plants and nature on its labels.

33.     Appendix B includes the front and back labels for each of the Herbal Essences and Pantene Products.

34.     A representative image of the Herbal Essences "Real Botanicals" Products' front label for the Herbal Essences Argan Oil Shampoo is shown below:



35.     The front label of the Herbal Essences "Real Botanicals" Argan Oil Conditioner contains the statement "90% natural-origin" in large, highly visible text in the middle of the label, just below the product's name. The front label also contains images of argan tree branches and fruit/nuts as its background. The other Herbal Essences Products contain essentially identical claims and analogous plant imagery.

36.     A representative image of the Herbal Essences "Real Botanicals" Products' back label for the Herbal Essences Argan Oil Shampoo is shown below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22   37.   The versions of the Herbal Essences "Real Botanicals" back label above displays

23   a table, one line of which states "Yes" next to "Real Botanicals" and another line of which state

24   "Yes" next to "90% natural origin*." As described above, the asterisk links to a statement in

25   smaller, less visible font stating "*Natural source ingredients with limited processing & purified

26   water. After processing, natural source ingredients maintain ≥ 50% of their natural origin

27   material."

28

38.     Some versions of the back label of the product state "[s]ince 1971, we've believed in bringing the beauty & experience of nature to your hair. Now we've partnered with Royal Botanical Gardens, KEW, to endorse our real botanicals. It is combined with natural source ingredient materials with limited processing & purified water to create this 90% natural origin conditioner."

39.     P&G also sells Herbal Essences "Certified Pure*Plants*" shampoos and conditioners, which make similar claims to the "Real Botanicals" Products, but with even stronger statements that the products are entirely plant-based.   Indeed, P&G labels this product line "Certified Pure*Plants*," giving the false impression they have been certified as wholly-plant based, and are "pure" plant products.  The "Certified Pure*Plants*" products contain even higher claims of "% Natural Origin," going up to "97% Natural Origin."  Like the "Real Botanicals" Products, the "Certified Pure*Plants*" products use prominent images of plants on their front labels to buttress the perception they are plant-based.  And like the Real Botanicals products, the Certified Pure*Plants* Products are also comprised primarily of synthetic chemicals.

40.     P&G's web site includes a page for each Herbal Essences "Real Botanicals" shampoo and conditioner that reinforces the messaging on the respective Herbal Essences bottle by emphasizing that the shampoo uses "real botanicals" and "made with at least 90% natural origin ingredients*." Below that, the page states *"*Purified water and natural-source ingredient materials with limited processing.*" The page for Herbal Essences Argan Oil Shampoo is shown below:

1

2

| Features | **Description** | Ingredients |

3

**Repair damaged hair with Herbal Essences Argan Oil Shampoo. Our real botanicals are certified by Royal Botanic Gardens, Kew, a leading expert on plants. This dermatologist-tested shampoo, with real botanicals, smooths, and soothes hair from root to tip.**

4

5

Crafted with our signature blend of real botanicals, Argan Oil Shampoo cleanses and helps repair for smooth, beautiful hair. This color-safe shampoo is pH-balanced and gently cleanses while infusing notes of fizzy citrus, exotic spices and creamy vanilla into your hair–leaving it soft and smooth. It is also certified PETA cruelty-free and comes packaged in recyled plastic.

6

7

Lather, rinse, and repeat with ease knowing your shampoo is paraben-free and dye-free, and made with at least 90% natural-origin ingredients.* Discover the wonders of nature–selected by experts, blended by us.

8

*Purified water and natural-source ingredient materials with limited processing.*

9

10          41.     On the front label of each of the Pantene Products, the "X% NATURALLY

11   DERIVED** INGREDIENTS" statement is made on the front label. In particular, the number (e.g.

12   "96%") is made in very large font relative to other text.  The "96% Naturally Derived**

13   Ingredient" claim is one of a select few claims made on the front label. Further, the claim is made

14   in a prominent panel in the center of the front label.  A representative front label is shown below

15   for Pantene Essential Botanicals Sulfate Free Conditioner with Apricot & Shea Butter is shown

16   below:

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21    42.    The label includes an adjacent statement that the Product has "0% sulfates,

22  parabens, dyes, mineral oil, phthalates, phosphates."  Placing the "96% Naturally Derived

23  Ingredients" claim immediately below the "0%" claim listing chemicals reinforces the impression

24  that the "naturally-derived ingredients" are taken directly from nature, as opposed to being the

25  product of industrial chemical manufacturing.

26    43.    The Pantene Products further include the italicized descriptor "*essential*

27  *botanicals*" in bright, contrasting color, as well as images of plants, including apricots, flowers,

28  and shea nuts, on the bottle.

44.     A representative image of the Products' back label is shown below for Pantene Essential Botanicals Sulfate Free Conditioner with Apricot & Shea Butter:



45.     The front label "96% NATURALLY DERIVED** INGREDIENTS" claim includes a double asterisk.  The front label double asterisk links to a back label statement in smaller, harder to read font stating ""*Natural source ingredients with limited processing & purified water create this 96% natural origin conditioner. After processing, natural source ingredients maintain ≥ 50% of their natural origin material."

46.     Print ads for Pantene's Essential Botanicals Sulfate Free Volumizing Shampoo and Conditioner Products in Crisp Apple & Honeysuckle scent further tout them as "Naturally Nourishing," thereby reiterating the emphasis on "naturally derived" ingredients.  On information and belief, Defendants use similar ads for the other Pantene Products as well.

47.     P&G's web site reinforces the messaging on the Pantene bottle by emphasizing that the shampoo uses "essential botanicals," "with passion fruit & cocoa butter," and "made with at least 90% naturally-derived** ingredients." Below that, the web page states "**Natural source ingredients with limited processing & purified water create this 90% natural origin shampoo/conditioner. After processing, natural source materials maintain ≥ 50% of their natural origin material," as shown below:



48.     These images and references to "natural source ingredients" reiterate the message that each Product is made of natural ingredients such as passion fruit and cocoa butter, obtained directly from plant sources.

49.     Each of the Products also contains a list of ingredients.  This list is placed on the back of the Products' packaging, where it is less likely to be seen.  The ingredient lists are also displayed on P&G's web site.

50.     The web site ingredient list for the Herbal Essences Argan Oil Repair Shampoo is shown below:

**FEATURED**

## Argan oil *(Argania spinosa)*

**The liquid gold from the ancestral sun-beaten forests of Morocco Learn more >**

**Ingredients/ingrédients:** Water, Sodium Lauryl Sulfate, Glycol Distearate, Sodium Chloride, Argania Spinosa Kernel Oil, Aloe Barbadensis Leaf Juice, Histidine, Ecklonia Radiata Extract, Cocamidopropyl Betaine, Sodium Citrate, Sodium Xylenesulfonate, Fragrance, Dimethiconol, Citric Acid, Sodium Benzoate, Guar Hydroxypropyltrimonium Chloride, Dimethicone, Tetrasodium EDTA, TEA-Dodecylbenzenesulfonate, Trideceth-10, Methylchloroisothiazolinone, Benzylalcohol, Methylisothiazolinone.

Argan Oil (i.e. Argania Spinosa kernel Oil) is the fifth listed ingredient by weight. Ecklonia Radiata extract is listed as the seventh ingredient by weight. Along with water, the first ingredient by weight listed, these are the only natural ingredients obtained from a natural source in the ingredient list. (N.B. it is also possible that "fragrance" could include natural ingredients, but that is not clear from the ingredient list.)

51.     The ingredient list for Pantene Essential Botanicals Passion Fruit & Cocoa Butter Shampoo on P&G's website is shown below:

INGREDIENTS                                                                                                    ⌃

Water, Sodium Lauryl Sulfate, Sodium Laureth Sulfate, Cocamidopropyl Betaine, Glycol Distearate, Fragrance, Citrus Limon (Lemon) Peel Oil, Sodium Citrate, Cocamide MEA, Sodium Xylenesulfonate, Dimethicone, odium Chloride, Citric Acid, Panthenol, Sodium Benzoate, Tetrasodium EDTA, Guar Hydroxypropyltrimonium Chloride, Polyquaternium-6, Panthenyl Ethyl Ether, Histidine, Passiflora Edulis Fruit Extract, Theobroma Cacao (Cocoa) Seed Butter, Methylchloroisothiazolinone, Methylisothiazolinone

Passion fruit extract ("Passiflora Edulis Fruit Extract") is the twenty-first ingredient listed by weight. Cocoa Butter (i.e., Theobroma Cacao Seed Butter) is the twenty-second ingredient listed by weight. Citrus Limon (Lemon) Peel Oil is listed at the seventh ingredient by weight. Along with water, the first ingredient by weight listed, these are the only natural ingredients obtained from a natural source in the ingredient list.

**P&G's "Natural Origin" and "Naturally-Derived" Claims Are False and Misleading**

52.     The ingredient lists establish that natural ingredients such as argan oil, passion fruit, and cocoa butter are minor components of each Product.

53.     The exact ingredients vary from one P&G Herbal Essences and Essential Botanicals hair care product to the next, but they all establish that the Products are predominantly

composed of ingredients produced using industrial chemical processes. For the shampoos, such ingredients include sodium lauryl sulfate, sodium laureth sulfate, glycol distearate, histidine, cocamidopropyl betaine, cocamidopropyl MEA, sodium citrate, sodium xylenesulfonate, dimethonicol, dimethicone, sodium benzoate, guar hydroxypropyltrimonium chloride, TEA-dodecylbenzenesulfonate, citric acid, hydroxypropyl methylcellulose, tetrasodium EDTO, niacinamide, tridecath-10, benzyl alcohol, methylchloroisothiazolinone, and methylisothiazolinone. For the conditioners, such ingredients include, for example, stearyl alcohol, behentrimonium chloride, cetyl alcohol, bis-aminopropyl dimethicone, histidine, benzyl alcohol, disodium EDTA, citric acid, methylchloroisothiazolinone, and methyliothiazolinone. The ingredient lists identify some compounds, such as citric acid, that occur in nature but are manufactured using industrial processes to meet the demands of mass-produced goods like the Products. Excluding differences in fragrances and extracts, the industrially manufactured ingredients appear to be the same within each brand and product line (e.g., Herbal Essences shampoos).

54.     For example, of the 24 ingredients listed for the Essential Botanicals Passion Fruit & Cocoa Butter Shampoo, 18 are industrially-produced chemicals that most consumers would not identify as "natural" or "naturally derived," including one (citric acid) produced using industrial fermentation processes. One additional ingredient ("fragrance") is of ambiguous origin, though most consumer product fragrances are industrially-produced. Only water, sodium chloride, lemon peel oil, passion fruit extract, and cocoa butter are unequivocally natural in origin. Accordingly, if one were assessing the "% naturally derived ingredients" by number of ingredients, at most 25% of the Essential Botanical  ingredients are naturally derived.

55.     As the above examples demonstrate, nowhere near 90% of the Herbal Essences or 96% of the Pantene Products' ingredients are naturally derived.  Even if one assumed the "% Natural Origin"/"% Naturally-Derived" claims are based on weight—an interpretation that is not clear—the only way the claim could be true is if it were based almost solely on water content. But even if that were true, the claims would suggest to a reasonable consumer that the Products predominantly used natural ingredients obtained from natural sources with "minimal processing"

that exclude industrial chemical modifications.  Given that, excluding water, the top five ingredients by weight for the Pantene Essential Botanicals Apricot and Shea Butter Infused Conditioner are "stearyl alcohol, behentrimonium chloride, cetyl alcohol, [and] bis-aminopropyl dimethicone"—all of which are industrially-produced chemicals—the Product is, on information and belief, > 4% non-naturally-derived ingredients by weight. Thus, the "96% naturally derived ingredients" claim is false. And even if it is not false, it is misleading, for the reasons described further below.

56.     In short, the Products are predominantly composed of ingredients that are produced using industrial chemical processes. These ingredients are not "naturally derived" or of "natural origin."

57.     On information and belief, even if one interpreted the claim to refer to the proportion by weight of the product that is *naturally derived or natural origin ingredients (i.e., naturally occurring compounds obtained from natural sources)*, the claim is not true.

58.     Defendant falsely and misleadingly refers to synthetic, industrially-manufactured chemicals as "naturally derived" by assigning them a "% naturally derived" value based on percentage of the synthetic molecule, by mass, that was present in a naturally derived starting material.  In other words, Defendant mischaracterizes industrial chemicals as "natural origin" or "naturally-derived" in order to "greenwash" the Products and make them seem safer and more environmentally friendly.

59.     Defendant's "naturally derived"/"natural origin" characterizations are based on the British Standards Institute's ISO[1] 16128: "Guidelines on technical definitions and criteria for natural and organic cosmetic ingredients and products." This standard sets forth an algorithm for calculating the % of a product that is of "natural origin." It begins by defining "derived natural ingredients" as "cosmetic ingredients of greater than 50 % natural origin, by molecular weight, by renewable carbon content, or by any other relevant methods, obtained through defined

---

[1] "ISO" is an acronym for 'International Organization for Standardization," which the BSI identifies as "a worldwide federation of national standards bodies."

chemical and/or biological processes with the intention of chemical modification." ISO 16128 goes on to define the "natural origin index" as "a value indicating the extent to which a cosmetic ingredient meets the definitions of either natural ingredients in ISO 16128-1:2016, Clause 2, derived natural ingredients from ISO 16128-1:2016, Clause 3, or derived mineral ingredients from ISO 16128-1:2016, Clause 4." Broadly speaking, the "value indicating the extent to which a cosmetic ingredient meets" the standards corresponds to the percentage by weight of the end product that was in a natural starting material. On information and belief, Defendant uses this same basic algorithm as used for "natural origin index" and reports the result as "% natural origin" or "% naturally derived."

60. ISO 16128 is unavailable to the public as a practical matter, as it is based on a 46-page proprietary standard (ISO 16128, parts 1:2016 ("Definitions for Ingredients") and 2:2017 ("Criteria for ingredients and products")) copyrighted by the British Standards Institute (BSI), a private, for-profit institution. The BSI forbids public distribution of the standard without its permission. Instead, the BSI sells the standard for roughly $400. As such, the BSI fails to disseminate the "standard" freely to the public at large.

61. To obtain the standard in its entirety, a consumer would need to purchase two BSI publications costing a total of nearly $400. This is both unlikely and unreasonable for an ordinary consumer.

62. The end result is that, for all intents and purposes, the public is entirely ignorant of how P&G calculates the percentage of ingredients that is naturally derived/natural origin and what P&G is communicating when it makes the naturally derived/natural origin claims.

63. Even if the public did have access to ISO 16128, it is not designed for use in labeling and product communications—a fact which BSI states in the very first section of each volume of the standard. For instance, volume 2 states:

> Neither ISO 16128-1 nor this document [i.e., ISO 16128-2] addresses product communication (e.g. claims and labelling), human safety, environmental safety, socio-economic considerations

(e.g. fair trade), characteristics of packaging materials or regulatory requirements applicable for cosmetics.

(Emphasis added.).  It is inherently problematic for Defendant to use a standard that explicitly states it is not addressing consumer-facing product claims and labelling for those purposes.

64.     ISO 16128's definition of "natural origin index" is very complicated and entirely beyond the ability of an ordinary consumer to understand. Chemical reactions which may be used to create "derived natural" compounds under ISO 16128 include amidation, olefin metathesis, Aldol reactions, Knoevenagel condensation, Claisen condensation, sulphation, hydrolysis, hydrogenation, the Guerbet reaction, and any form of oxidation or reduction. The natural origin index for the product as a whole is then calculated using a weight-adjusted summation of the % natural origin for each of the constituent ingredients.

65.     ISO 16128 is also inappropriate for use in labeling because it does not require uniform calculations. Instead, it allows the party calculating the "natural origin index" (i.e., the % natural origin or naturally derived) to include or exclude added water, depending on the party's preference. Accordingly, the same product could have two different "% natural origin" indices (i.e., % naturally derived), depending on who calculated it.  The standard is also ambiguous in that it defines "derived natural" ingredients as those of 50% or more "natural origin," measured by any of three criteria: "molecular weight," "renewable carbon content", or "any other relevant methods." But the standard does not define "renewable carbon content," nor what the "any other relevant methods" may be.  Laypeople are not versed in assessing molecular weights either.

66.     The stated purpose of ISO 16128 is "to encourage a wider choice of natural and organic ingredients in the formulation of a diverse variety of cosmetic products to encourage innovation." In other words, ISO 16128's purpose is to provide an expansive definition "natural origin" to encourage manufacturers to use "natural" materials as ingredients for manufacturing.

67.     ISO 16128 is not a government standard, nor even a publicly agreed to standard. The BSI created ISO 16128 without any public comment.  Based on information on the ISO web site, it appears that ISO 16128 was designed solely by cosmetic industry scientists, without involvement of any consumer advocates or persons familiar with consumer advertising.

68.     For comparison of ISO 16128's use of "naturally derived" to an ordinary consumer's understanding of that term, consider aspartame. It is an artificial sweetener, in the sense that it is entirely man-made and does not occur in nature.  But it is potentially 100% "natural origin" under ISO 16128, because all the starting materials used to make it (two amino acids and methanol) are naturally-occurring compounds. But most ordinary consumers would not view aspartame as natural or "100% naturally derived."  This underscores how misleading ISO 16128 is when used in advertising, as Defendant's Product labels do.

69.     Similarly, hydrogenated vegetable oils, synthetic materials created using an industrial process which cannot be advertised as "natural" in foods, would be advertised as ~99% "natural origin" in cosmetics using the ISO 16128 standard, because only the added hydrogens would be deemed "non-natural"; the overwhelming majority of the mass of the hydrogenated vegetable oils would be the carbon, hydrogen, and oxygen atoms in the original vegetable oils. While the standards applicable to foods do not legally control cosmetic advertising, the fact that such claims would not be allowed in the food context demonstrates that most ordinary consumers would view ISO 16128's characterization of hydrogenated oils as >90% naturally derived as false and misleading.

70.     Even dioxins, toxic materials produced as byproducts when burning wood, could be categorized as "90% "natural origin," since the bulk of the mass of the dioxins are from wood, which is a natural material. Again, this demonstrates how ISO16128 falsely and misleadingly characterizes synthetic compounds as primarily "naturally derived."

71.     ISO 16128 is particularly inappropriate for use in marketing beauty products because the chemicals used in many beauty products have particularly high molecular weights, such that even extensive chemicals modification is unlikely to change 50% or more of the starting ingredient's molecular weight.  That is particularly true for the fatty acids and esters used in shampoos, conditioners, and moisturizers.

72.     Ultimately, the only major group of chemicals deemed not "natural origin" or "naturally derived" under ISO 16128 is petroleum-based chemicals and new chemical materials whose mass is 50% or more derived from petrochemicals.  This demonstrates that the ISO 16128

is arbitrary, in that a material whose mass is 49% from petroleum will be categorized 51% naturally derived, but one whose mass is 50% from petroleum will be categorized 0% naturally derived.

73.     Defendant's labels are also misleading because, in combination with the labels' prominent and repeated references to natural ingredients such as "passion fruit," "cocoa butter," and "argan oil," P&G falsely suggests that plant-based compounds comprise a majority of the products' ingredients and/or weight.  P&G further reinforces this false and misleading claim by contrasting it with the "0%" claims for certain chemicals (e.g., parabens), which suggests that the "naturally derived"/"natural origin" ingredients are not industrially-manufactured chemicals, even though they actually are.

74.     As the examples above show, the "% Natural Origin"/"% Naturally Derived" claims made by P&G are even more confusing than "100% natural-origin" claims, because representing that, e.g., "80%" of ingredients are "natural-origin" requires the consumer to interpret how the 80% value was calculated. As a practical matter, "100% natural" always means the same thing, irrespective of how it is calculated. In contrast, a statement that a product is "80% natural-origin" ingredients is open to varying interpretations regarding whether that refers to a percentage of ingredients, mass, volume, or other measurement, each of which could mean very different things with respect to how much of the product is "natural" of "naturally derived."

75.     Concerned observers have noted the trend of advertising products as being made from "naturally derived" ingredients is misleading.

76.     For example, Chagrin Valley Soap and Salve, a company dedicated to marketing products made from natural ingredients, notes:

**Derived From . . . Naturally Derived From . . . Made From . . . Quite Confusing**

You will often see these words listed before or after an ingredient in a skincare product. So what do they mean? As usual, there is no standard for these terms so the consumer is left scratching their heads and asking the question, "Is this product natural."

Coconut is still considered natural whether it is whole, dried, or shredded. We can even obtain natural coconut oil, coconut milk, and coconut with

minimal changes to the original coconut. However, once the oil is biochemically altered, it then becomes naturally derived or even synthetic.

A product label will list a chemical ingredient followed by the phrase "derived from …some natural substance." For example, cocamide diethanolamine (cocamide DEA) can be derived from the fatty acids of natural coconut oil.

Although this ingredient may start out as natural coconut oil, by the time it is separated out using petrochemicals and chemical solvents, and further processed to create a foam boosting agent--it is far from coconut oil and far from natural!

A product label will list a chemical ingredient followed by the phrase "naturally derived from …some natural substance." The words "naturally derived" live in a gray area because it is difficult to know if the ingredient is closer to natural or synthetic.

Just how far down the road from its natural source has this ingredient traveled? Some of these ingredients may be minimally processed and therefore are closer to their natural source. But others have been processed many times and depending on the "process" they may not resemble the original botanical ingredient at all. What determines the "naturalness" of a derived ingredient totally depends on the type of process used to manufacture that ingredient. Unfortunately, the consumer is not provided with this information.

A product label will list a chemical ingredient followed by the phrase "made from …some natural substance." Your guess is as good as mine.

This type of labeling is misleading for consumers.

https://www.chagrinvalleysoapandsalve.com/blog/posts/but-the-label-says-natural/ (last accessed December 6, 2022).

77. Members of the Ninth Circuit have commented that P&G's "greenwashing" is a disturbing and increasingly common practice:

. . . P&G's labeling nonetheless resembles a concerning practice known as "greenwashing." Greenwashing refers to "a set of deceptive marketing practices in which an entity publicly misrepresents or exaggerates the positive environmental impact or attributes of a product[.]" Amanda Shanor & Sarah E. Light, Greenwashing and the First Amendment, 122 Colum. L. Rev. 2033, 2037 (2022); see also *id*. at 2056–57. The practice of greenwashing has resulted from the increasing number of American consumers who want to buy environmentally friendly, or "green," products. See 16 C.F.R. § 260.1 ("the Green Guides").

> Greenwashing is not limited to environmental effects and is also used to describe the misleading or false labeling of a wide range of consumer products. For example, the practice of greenwashing also affects "the way consumers buy cosmetic and personal products." Alexa Riccolo, The Lack of Regulation in Preventing Greenwashing of Cosmetics in the U.S., 47 J. Legis. 120, 122 (2021). In the context of cosmetics and personal care products (e.g., shampoos and conditioners), the term is used to describe products that have "natural" labeling "but actually contain chemicals[.]" *Id*.

*McGinnity v. The Procter & Gamble Company*, No. 22-15080 (9th Cir. 2022) (J. Gould, concurring). Although *McGinnity* affirmed dismissal of a false advertising claim against P&G arising from the phrase "Nature Fusion", that case is distinguishable because P&G argued that it had given notice to consumers that its ingredients were not "natural" by disclosing chemicals on the back label. Here, P&G has advertised that those chemicals are naturally sourced; the ingredient list cannot act as notice that the chemicals are not natural if P&G is telling consumers that those same chemicals are "naturally derived" or of "natural origin."

78.    An ordinary consumer would not have the knowledge required to determine which of the ingredients is natural or naturally derived versus being the product of an industrial chemical process. There mere fact that an ingredient has a "chemical sounding" name is no definitive indication whether it is natural or naturally derived versus synthetic. For example, citric acid is a naturally-occurring compound, but is produced industrially using either chemical synthesis or genetically-modified yeast. Cocamidopropyl betaine sounds like it might be natural, given the reference to coconuts in its name (i.e., "coc-"), but it is made in a two-step industrial process, beginning with the reaction of dimethylaminopropylamine with fatty acids from coconut or palm kernel oil, followed by use of chloroacetic acid to form the final product. Thus, despite sometimes using coconut oil as a starting material, there is nothing natural about it. As a result, these and other "naturally derived" claims made by P&G are false and misleading to consumers.

79.    In contrast, P&G knows or should know that its claims are false and/or misleading, because the BSI explicitly stated in the ISO 16128 publication that "Neither ISO 16128-1 nor this document [i.e., ISO 16128-2] addresses product communication (e.g. claims and labelling), . . . characteristics of packaging materials or regulatory requirements applicable for cosmetics." In other words, the BSI told P&G and other third parties that the standard was not suitable for

consumer communications (i.e., advertisements, labels, and marketing). P&G thus had actual or constructive knowledge that ISO 16128 was likely to deceive and/or confuse consumers.

80.     P&G's label claims conflict with official guidance from the Federal Trade Commission. The "Green Guides," mentioned in *McGinnity*, instruct businesses to avoid "overstatement of environmental attributes," such as by characterizing an increase in recycled content from 2% to 3% as a "50% increase in recycled content," or advertising a trach bag as recyclable when trash bags are routinely not recycled. See 16 C.F.R. 230(c). Similarly, the Green Guides state that, even if a marketer explains and can substantiate a product's environmental benefits, advertisements of environmental benefits may be misleading if the advertisement otherwise implies deceptive claims. See id., § 260.4. The Products' "natural origin"/ "naturally derived" ingredients claims are misleading in this respect, because they suggest that, because a majority of the molecular mass of the ingredients were sourced from non-petroleum sources, they are environmentally friendly and more "natural." This is misleading because a synthetic chemical is not "natural" in any meaningful respect regardless of where its primary starting material was sourced, and there are many environmental effects that have no relation to the molecular mass of the starting material relative to the end product (e.g., the use of toxic chemicals in manufacturing, the identity of byproducts, the amount of energy used to manufacture the chemicals, etc.).

81.     The Green Guides also state it is deceptive to misrepresent, directly or indirectly, that a "product or package" is "made with renewable materials." 16 C.F.R. 260.16(a). As noted above, ISO 16128 identifies "renewable carbon content" as a basis for claiming a product is "naturally derived" or "natural origin." Accordingly, P&G's references to "natural origin" and "naturally derived" ingredients are also misleading because they fail to identify with sufficient specificity the basis for the natural content claims.

82.     In many cases, P&G's claims are based on the specious assumption that merely using a plant as the initial source of carbon content makes the resulting synthetic chemical environmentally friendly. This assumption is false because many of the ingredients (e.g., palm oil) begin as plants grown in environmentally damaging ways. While these ingredients come from plants, the monoculture plantations where such plants are grown are often made by clear-

cutting rain forests and other natural habitats, resulting in substantial environmental degradation. Further, there is no guarantee those plants are grown using organic farming methods, as opposed to using pesticides and other environmentally-damaging chemicals. Accordingly, marketing these ingredients as environmentally-friendly by labeling them "Natural Origin" or "Naturally-Derived" is false or misleading.  See Amberg, Resources at 3 (noting green cosmetics were aimed at "environmental conservation, minimization of polluting, responsible usage of non-renewable resources, and *preservation of fauna and species*) (emphasis added).

## PLAINTIFFS' ALLEGATIONS

**Loraine McWhorter**

83.    Plaintiff Loraine McWhorter purchased P&G Herbal Essences Argan Oil Repair Shampoo and White Charcoal Real Botanicals 90% Natural Origin Conditioner from a Walmart in Contra Costa County, California on multiple occasions beginning in November 2022.

84.    Plaintiff McWhorter made each of her purchases of the P&G Herbal Essences product after reading and relying on the product labels that promised that the care products were made of  "90% NATURAL ORIGIN INGREDIENTS." She relied on the "90% NATURAL ORIGIN INGREDIENTS" representation for each purchase and purchased each product because of the "90% NATURAL ORIGIN INGREDIENTS" representations. She also believed in the truth of each representation, i.e., that the product was comprised of ingredients of which 90% were natural origin. Had Defendant not made the "90% NATURAL ORIGIN INGREDIENTS" claims on its packages in these circumstances, she would not have been drawn to the Products and would not have purchased them. At a minimum she would have paid less for each Product.

85.    Moreover, had Defendant adequately disclosed the number of ingredients that were naturally derived, Plaintiff McWhorter would not have purchased the Products or would have, at minimum, paid less for them. Plaintiff McWhorter regularly looks for natural ingredients before purchasing products and uses that as a basis for buying and/or comparing similar products. The presence and amount of natural and naturally derived ingredients in a product is a material factor in purchasing decisions by Plaintiff McWhorter.

86.     Plaintiff McWhorter paid for the Product under the mistaken belief that the it was made of 90% natural origin ingredients." The only information plaintiff had about the composition of the Product was the "90% natural origin ingredients" claim on the Product's label. She did not have any reason to believe that the Products were comprised of fewer than 90% natural origin ingredients as claimed on the labels. Nor did she have any reason to know the Products consisted of anything less than 90% natural origin ingredients.

87.     Ms. McWhorter continues to be interested in hair and cosmetic products comprised of natural and naturally derived ingredients, and in particular the P&G Products, and similar care products marketed as comprised of natural and naturally derived ingredients. However, she does not know whether any P&G Products she may purchase in the future will be subject to the same false advertising, and thus is subject to uncertainty whether her future purchases may subject her to similar economic harm.

**Sameer Sharma**

88.     Plaintiff Sameer Sharma purchased Pantene Essential Botanicals Apricot & Aloe Vera Shampoo and Conditioner from a Walmart store in Union City, California around November 11, 2023. Plaintiff Sharma viewed and relied upon the product label, including the statement that it was "96% NATURALLY DERIVED** INGREDIENTS," when purchasing the Pantene Essential Botanicals products.

89.     Plaintiff Sharma made each of his purchases of the P&G products after reading and relying on the product labels that promised that the care products were made of "96% NATURALLY DERIVED** INGREDIENTS." He relied on the "96% naturally derived ingredients" representation for each purchase and purchased each product because of the "96% NATURALLY DERIVED** INGREDIENTS" representations. He also read and relied upon the ancillary label representations indicating the products were "botanical" in nature, and comprised of apricots and aloe vera, including imagery of apricots and aloe vera. He also believed in the truth of each representation, i.e., that the product was comprised of ingredients of which 96% were naturally derived. Had Defendant not made the "NATURALLY DERIVED** INGREDIENTS" claims on its packages in these circumstances, He would not have been drawn

to the Products and would not have purchased them. At a minimum he would have paid less for each Product.

90.     Moreover, had Defendant adequately disclosed the number of ingredients that were naturally derived, Plaintiff Sharma would not have purchased the Products or would have, at minimum, paid less for them. Plaintiff Sharma regularly looks for natural ingredients before purchasing products and uses that as a basis for buying and/or comparing similar products. The presence and amount of natural and naturally derived ingredients in a product is a material factor in purchasing decisions by Plaintiff Sharma.

91.     Plaintiff Sharma paid for the Product under the mistaken belief that the it was made of 96% naturally derived ingredients." The only information plaintiff had about the composition of the Product was the "96% NATURALLY DERIVED** INGREDIENTS" claim on the Product's label. Although he saw the "96% NATURALLY DERIVED INGREDIENTS" claim, he overlooked the asterisks and associated statement due to their small size. He did not have any reason to believe that the Products were comprised of fewer than 96% naturally derived ingredients as claimed on the labels. Nor did he have any reason to know the Products consisted of anything less than 96% naturally derived ingredients.

92.     Mr. Sharma continues to be interested in hair and cosmetic products comprised of natural and naturally derived ingredients, and in particular the P&G products, and similar care products marketed as comprised of natural and naturally derived ingredients. However, he does not know whether any P&G hair care products he may purchase in the future will be subject to the same false advertising, and thus is subject to uncertainty whether his future purchases may subject him to similar economic harm.

1

**CLASS ALLEGATIONS**

2      93.     Plaintiffs bring this class action lawsuit on behalf of themselves and a proposed

3  class and subclass of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal

4  Rules of Civil Procedure. Plaintiffs seek to represent the following groups of similarly situated

5  persons, defined as follows:

6      **Class**: All persons in who purchased, in the State of California, the Products from

7      February 9, 2024 to the present.

8      94.     This action has been brought and may properly be maintained as a class action

9  against Defendant because there is a well-defined community of interest in the litigation and the

10  proposed classes are easily ascertainable.

11     95.     Numerosity: Plaintiffs do not know the exact size the Class/Subclass, but they

12  estimate that each is composed of more than 100 persons. The persons in the Class are so

13  numerous that the joinder of all such persons is impracticable and the disposition of their claims

14  in a class action rather than in individual actions will benefit the parties and the courts.

15     96.     Common Questions Predominate: This action involves common questions of law

16  and fact to the Class/Subclass because each class member's claim derives from the deceptive,

17  misleading, and/or false statements and omissions that led them to believe that the Products were

18  suitable for everyday use and could withstand routine exposure to sun, heat, and water. The

19  common questions of law and fact predominate over individual questions, as proof of a common

20  or single set of facts will establish the right of each member of the Class/Subclass to recover. The

21  questions of law and fact common to the Class/Subclass are:

22      a.     Whether Defendant deceptively, unlawfully, and/or unfairly misrepresented to the

23             Class/Subclass that the Products were comprised of "80% naturally derived

24             ingredients" and primarily of plant-based materials;

25      b.     Whether Defendant's actions violate California laws invoked herein;

26      c.     Whether Defendant's advertising and marketing regarding the Products was likely

27             to deceive reasonable consumers;

28

d.      Whether Defendant's representations or omissions are material to reasonable consumers;

e.      Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

f.      The amount of profits and revenues earned by Defendant as a result of the conduct;

g.      Whether class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

h.      Whether Class/Subclass members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

97.    Typicality: Each Plaintiff's claims are typical of the claims of the other members of the Class/Subclass because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each member of the Class/Subclass were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

98.    Adequacy of Representation: Each Plaintiff will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which she complains. Each Plaintiff also has no interests that are in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

99.    Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment

of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class/Subclass may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

100.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### PLAINTIFFS' FIRST CAUSE OF ACTION
(Fraud, Deceit and/or Misrepresentation)
On Behalf of Each Plaintiff and the Class

101.    Each Plaintiff realleges and incorporates by reference all preceding paragraphs of this Class Action Complaint as if fully set forth herein.

102.    As set forth above, Defendant falsely and/or deceptively represented to each Plaintiff and those similarly situated that the Products were comprised of X% naturally derived/natural origin ingredients and/or primarily of plant-based materials when, in fact, the Products were not. (Specifically, Defendant advertised the Products as 90% to 97% natural origin/naturally derived ingredients, depending on the specific product.) Defendant knew that the Products were not comprised of "X% naturally derived ingredients" or made primarily from plant-based materials, yet advertised that they were. P&G made false and/or deceptive representations and statements (by omission and commission) that led reasonable consumers to believe that that the Products were comprised of ≥X% naturally derived/natural origin ingredients and comprised primarily of plant-based materials.

103.    Defendant's misrepresentations were material at the time they were made. They concerned material facts that were essential to the purchasing decisions of Plaintiffs and those

similarly situated.  care products that is not X% naturally derived ingredients or made primarily from plant based materials is worth less to consumers than  care products that is.

104.    Each Plaintiff and those similarly situated reasonably relied to their detriment on Defendant's representations. Had each Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, not purchasing (or paying less for) the Products.

105.    By and through such fraud, deceit, and/or misrepresentations, Defendant intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendant fraudulently and deceptively induced each Plaintiff and those similarly situated to, without limitation, purchase the Products.

106.    As a direct and proximate result of Defendant's fraud and misrepresentations, each Plaintiff and those similarly situated have suffered damages. In particular, each Plaintiff seeks to recover on behalf of herself and those similarly situated the amount of the price premium they paid (i.e., the difference between the price consumers paid for the Products and the price they would have paid but for Defendant's misrepresentations), in an amount to be proven at trial.

107.    Defendant's conduct as described herein was willful and malicious and was designed to maximize Defendant's profits even though Defendant knew that it would cause loss and harm to Plaintiffs and those similarly situated.

**PLAINTIFFS' SECOND CAUSE OF ACTION**
**(Violation of the Consumers Legal Remedies Act,**
**California Civil Code § 1750, et seq.)**
**On Behalf of Each Plaintiff and the California Subclass**

108.    Each Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

109.    This cause of action is brought pursuant to the California Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* ("CLRA").

110.    Defendant's actions, representations, omissions, and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods to consumers.

111.    Each Plaintiff and other members of the class are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

112.    The Products that each Plaintiff and similarly situated members of the class purchased are "goods" within the meaning of California Civil Code § 1761.

113.    By engaging in the actions, representations, and conduct set forth in this Class Action Complaint, as described above, Defendant has violated, and continues to violate, §§ 1770(a)(5), 1770(a)(7), and 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(2), Defendant represented source, sponsorship, approval, or certification of goods or services that they do not have. In violation of California Civil Code §1770(a)(3), Defendant represented affiliation, connection, or association with, or certification by, another that they do not have. In violation of California Civil Code §1770(a)(5), Defendant represented that goods have approval, characteristics, uses, benefits, and qualities that they do not have. In violation of California Civil Code §1770(a)(7), Defendant's acts and practices constitute improper representations that the goods and/or services it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(9), Defendant advertised goods with intent not to sell them as advertised.

114.    Specifically, Defendant's acts and practices led consumers to believe that X% of the ingredients in the Products were naturally derived and/or of natural origin, when they were not. P&G additionally made representations and statements (by omission and commission) that led reasonable consumers to believe that that the Products were primarily plant-based, including use of coconut oil, aloe vera, argan oil, and other natural materials as predominant ingredients.

115.    Further, Defendant omitted material facts that it had a duty to disclose, as alleged above.

116.    Defendant's concealment of the true characteristics of the Products was material

to Plaintiffs and class members. Had they known the truth, Plaintiffs and the class members would not have purchased the Products, or would have paid significantly less for them.

117.    Defendant, as explained above, had an ongoing duty to Plaintiffs and the class members to refrain from unfair and deceptive practices under the CLRA in the course of their business. Specifically, Defendant owed Plaintiffs and class members a duty to disclose material facts concerning the Products because it possessed exclusive knowledge, it intentionally concealed them from Plaintiffs and class members, and/or it made partial representations that were misleading since it concealed the aforementioned facts.

118.    Plaintiffs and class members had no way of learning the facts that Defendant had concealed or failed to disclose because they were not experts in chemistry or chemical manufacturing, and did not have access to information regarding which materials Defendant considered "naturally derived," nor its basis for that characterization.

119.    Plaintiffs and class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and/or failure to disclose material information.

120.    Each Plaintiff requests that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendant is not restrained from engaging in these types of practices in the future, Plaintiffs and other members of the class will continue to suffer harm.

121.    On July 18, 2022, Plaintiff Ringler provided Defendant with notice and demand on behalf of herself and all others similarly situated that Defendant correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the aforementioned notice and demand, Defendant failed to do so in that, among other things, it failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Accordingly, Plaintiffs seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated class members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendant's acts and practices.

122.    Plaintiffs also request that this Court award their costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## PLAINTIFFS' THIRD CAUSE OF ACTION
### (False Advertising, Business and Professions Code § 17500, et seq. ("FAL"))
### On Behalf of Each Plaintiff and the California Subclass

123.    Each Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

124.    Beginning at an exact date unknown to each Plaintiff, but within three (3) years preceding the filing of the Class Action Complaint, Defendant made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Products, and in particular those advertised as comprising "X% naturally derived ingredients" and/or "Z% natural origin ingredients."

125.    As set forth in this Class Action Complaint, Defendant has made representations and statements (by omission and commission) that led reasonable consumers to believe that 80% of the ingredients in the Products were naturally derived. Crocs additionally made representations and statements (by omission and commission) that led reasonable consumers to believe that that the Products were primarily plant-based.

126.    Each Plaintiff and those similarly situated relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, paying less for the Products.

127.    Defendant's acts and omissions are likely to deceive the general public.

128.    Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

129.   The aforementioned practices, which Defendant has used, and continues to use, to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

130.   Each Plaintiff seeks, on behalf of those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiffs, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon. Though Plaintiffs did not buy the Products directly from Defendant, a certain amount of money flowed from Plaintiffs who purchased the Products through retailers to Defendant. Plaintiffs seek restitution of those amounts. If Plaintiffs' and class members' claims at law fail, Plaintiffs, those similarly situated and/or other consumers will have no adequate remedy at law by which they can obtain recovery for the economic harm they have suffered. Each Plaintiff seeks, on behalf of those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. The acts complained of herein occurred, at least in part, within three (3) years preceding the filing of this Class Action Complaint.

131.   Each Plaintiff and those similarly situated are further entitled to and do seek both a declaration that the above-described practices constitute false, misleading and deceptive advertising, and injunctive relief restraining Defendant from engaging in any such advertising and marketing practices in the future. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which Defendant is not entitled. Plaintiffs, those similarly situated and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

132.   As a direct and proximate result of such actions, each Plaintiff and the other members of the Class have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

**PLAINTIFFS' FOURTH CAUSE OF ACTION**
**(Negligent Misrepresentation)**
**On Behalf of Each Plaintiff and the Class**

133.   Each Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

134.   In selling the Products to consumers, Defendant made false and misleading statements regarding them, as described more fully above. Defendant, however, deceptively failed to inform consumers, at the time of their purchase, that less than X% of the ingredients in the Products were naturally derived or natural origin. Defendant additionally made representations and statements (by omission and commission) that led reasonable consumers to believe that that the Products would mold to their feet fit well.

135.   These representations were material at the time they were made. They concerned material facts that were essential to the decisions of Plaintiffs and those similarly situated regarding how much to pay for the Products.

136.   Defendant made identical misrepresentations and omissions to members of the Class regarding the Products.

137.   Defendant should have known its representations were false, and that it had no reasonable grounds for believing them to be true when it made them.

138.   By and through such negligent misrepresentations, Defendant intended to induce each Plaintiff and those similarly situated to alter their position to their detriment. Specifically, Defendant negligently induced each Plaintiff and those similarly situated, without limitation, to purchase or lease the Products at the price they paid.

139.   Each Plaintiff and those similarly situated reasonably relied on Defendant's representations. Specifically, each Plaintiff and those similarly situated paid as much as they did for the Products.

140.    Because Plaintiffs reasonably relied on Defendant's false representations, each Plaintiff and those similarly situated were harmed in the amount of the price premium they paid (i.e., the difference between the price they paid for the Products and the price they would have paid but for Defendant's misrepresentations).

### PLAINTIFFS' FIFTH CAUSE OF ACTION
**(Unfair, Unlawful and Deceptive Trade Practices,
Business and Professions Code § 17200, *et seq.*)
On Behalf of Each Plaintiff and the California Subclass**

141.    Each Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

142.    Within four (4) years preceding the filing of this Class Action Complaint, and at all times mentioned herein, Defendant has engaged in, and continues to engage in, unfair, unlawful and deceptive trade practices in California by carrying out the unfair, deceptive and unlawful business practices outlined in this Class Action Complaint. In particular, Defendant has engaged in, and continues to engage in, unfair, unlawful and deceptive trade practices by, without limitation, the following:

      a.    engaging in misrepresentation and omissions as described herein;

      b.    violating the California Consumer Legal Remedies Act as described herein;

      c.    violating the FAL as described herein.

143.    Each Plaintiff and those similarly situated relied to their detriment on Defendant's unfair, deceptive and unlawful business practices. Had each Plaintiff and those similarly situated been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation, not paying for, or, at a minimum, paying less for the Products.

144.    Defendant's acts and omissions are likely to deceive the general public.

145.    Defendant engaged in these unlawful, deceptive, and unfair practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

146.    In addition to the unlawful and deceptive acts described above, Defendant engaged in unfair practices by violating the Federal Trade Commission's guides against bait advertising. 16 C.F.R. §§ 238.1-4. The policy provides that "No statement or illustration should be used in any advertisement which creates a false impression of the grade, quality, make, value, currency of model, size, color, usability, or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another." 16 C.F.R. § 238.2(a). Defendant's aforementioned acts violated this policy, including its representations that the Products comprised "80% naturally derived ingredients," and that coconut oil and aloe vera were major ingredients.

147.    The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provides an unlawful advantage over Defendant's competitors as well as injury to the general public.

148.    As a direct and proximate result of such actions, each Plaintiff and the other members of the Class have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the Class lost the amount of the price premium they paid (i.e., the difference between the price consumers paid for the Products and the price they would have paid but for Defendant's misrepresentations), in an amount to be proven at trial. If Plaintiffs' and class members' claims at law fail, Plaintiffs, those similarly situated and/or other consumers will have no adequate remedy at law by which they can obtain recovery for the economic harm they have suffered.

149.    Each Plaintiff seeks, on behalf of those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

150.    Each Plaintiff seeks, on behalf of those similarly situated, an injunction to prohibit Defendant from offering the Products within a reasonable time after entry of judgment, unless. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in

that Defendant will continue to violate the laws of California unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which Defendant was not entitled. Plaintiffs, those similarly situated and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## PRAYER FOR RELIEF

**WHEREFORE**, each Plaintiffs, on behalf of themselves and those similarly situated, respectfully requests that the Court enter judgment against Defendant as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    An award of compensatory damages in an amount to be determined at trial, except for those causes of action where compensatory damages are not legally available;

D.    An award of statutory damages in an amount to be determined at trial, except for those causes of action where statutory damages are not legally available;

E.    An award of punitive damages in an amount to be determined at trial, except for those causes of action where punitive damages are not legally available;

F.    An award of treble damages, except for those causes of action where treble damages are not legally available;

G.    An award of restitution in an amount to be determined at trial;

H.    An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

I.    For reasonable attorneys' fees and the costs of suit incurred; and

J.    For such further relief as this Court may deem just and proper.

1

## JURY TRIAL DEMANDED

2

Plaintiffs hereby demand a trial by jury.

3

Dated: February 9, 2024

4
                                       GUTRIDE SAFIER LLP

5
                                       /s/Anthony J. Patek/

6
                                       Seth A. Safier (State Bar No. 197427)
                                         seth@gutridesafier.com

7
                                         Anthony J. Patek (State Bar No. 228964)
                                         anthony@gutridesafier.com

8
                                         100 Pine Street, Suite 1250
                                       San Francisco, CA 94111

9
                                         Telephone: (415) 639-9090
                                       Facsimile:  (415) 449-6469

10
                                         Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPENDIX A

1

2

## CLRA DECLARATION

3          I, Loraine McWhorter, declare:

4          1.      I am a Plaintiff in this action. If called upon to testify, I could and would

5   competently testify to the matters contained herein based upon my personal knowledge.

6          2.      I submit this Declaration pursuant to California Code of Civil Procedure section

7   2215.5 and California Civil Code section 1780(d).

8          3.      I reside in Bethel Island, California. I purchased Proctor & Gamble's Herbal

9   Essences Argan Oil Repair Shampoo and White Charcoal Conditioner in November 2022, from a

10  Walmart located in Contra Costa County, CA.

11

12         I declare under penalty of perjury of the laws of the United States that the foregoing is true

13  and correct.  Executed in Bethel Island, CA.

14         Dated: _____

2/8/2024

DocuSigned by:

*Loraine McWhorter*

C626BD4ECB2B410...

15  _____

16                            Loraine McWhorter

17

18

19

20

21

22

23

24

25

26

27

28

CLRA Declaration

## CLRA DECLARATION

I, Sameer Sharma, declare:

1.      I am a Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.      I submit this Declaration pursuant to California Code of Civil Procedure section 2215.5 and California Civil Code section 1780(d).

3.      I reside in Hayward, California. I purchased Proctor & Gamble's Pantene Essential Botanicals Apricot & Aloe Vera Shampoo and Conditioner within the past year, from a Walmart located in Union City, CA.


I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.  Executed in Hayward, CA.

Dated:    2/8/2024
        _____


_____

Sameer Sharma

**Appendix B**

| | Product | Package Claims | Product Images |
|---|---|---|---|
| **Herbal Essences Real Botanicals Line** | | | |
| 1. | Argan Oil Conditioner Shampoo/Conditioner | "Real Botanicals"<br><br>"Argan Oil"<br><br>"90% Natural Origin"<br><br>"bio-renew" |  |

**Appendix B**

| 2. | Coconut Milk Shampoo/Conditioner | "Real Botanicals" "Coconut Milk" "90% Natural Origin" "bio-renew" |  |
|---|---|---|---|

**Appendix B**

| 3. | White Grapefruit & Mint Shampoo/Conditioner | "Real Botanicals"<br><br>"White Grapefruit & Mint"<br><br>"90% Natural Origin"<br><br>"bio-renew" |  |
|----|----|----|----|

**Appendix B**

| 4. | Golden Moringa Oil Shampoo/Conditioner | "Real Botanicals" "Golden Moringa Oil" "90% Natural Origin" "bio-renew" |  |
|---|---|---|---|
| | | | **About this item** |
| | | | **Product details** |
| | | | Hydrate and smooth hair with Herbal Essences Golden Moringa Oil Conditioner. Our real botanicals are endorsed by Royal Botanic Gardens, Kew, a leading expert on plants. This conditioner, with real botanicals, provides sleek, smooth hair from root to tip. |
| | | | Crafted with our signature blend of real botanicals, Golden Moringa Oil Conditioner moisturizes for smooth, beautiful hair. Color-safe and pH-balanced, this conditioner hydrates while infusing notes of juicy orange, white floral bouquet and coconut water into your hair?leaving it soft and smooth. |
| | | | Work into hair, rinse and repeat with ease knowing your conditioner is paraben free and colorant free and made with at least 90% natural-origin ingredients.* |
| | | | *Purified water and natural-source ingredient materials with limited processing. |
| | | | **Ingredients** |
| | | | **Ingredients** |
| | | | Water, Stearyl Alcohol, Behentrimonium Chloride, Cetyl Alcohol, Bis-Aminopropyl Dimethicone, Moringa Oleifera Seed Oil, Histidine, Citric Acid, Aloe Barbadensis Leaf Juice, Ecklonia Radiata Extract, Fragrance, Benzyl Alcohol, Disodium EDTA, Methylchloroisothiazolinone, Methylisothiazolinone |

**Appendix B**

| 5. | White Charcoal Shampoo/Conditioner | "Real Botanicals"  "90% Natural Origin"  "bio-renew" |  |
|----|-----|-----|-----|

**Appendix B**

| 6. | White Strawberry & Mint Shampoo/Conditioner | "Real Botanicals" | |
|---|---|---|---|
| | | "90% Natural Origin" |  |
| | | "bio-renew" | |

**Appendix B**

| 7. | Blue Ginger & Micellar Water Shampoo and Blue Ginger Conditioner | "Real Botanicals"<br><br>"90% Natural Origin"<br><br>"bio-renew" |  |

**Appendix B**

| 8. | Honey & Vitamin B | "Real Botanicals"<br><br>"87%[/90%] Natural Origin"<br><br>"bio-renew" |  |
| --- | --- | --- | --- |

**Appendix B**

| Herbal Essences Pure*Plants* Line | | | |
|---|---|---|---|
| 9. | Coconut Oil Conditioner | "Certified Pure*plants*" <br><br> "Coconut Oil" <br><br> "97% Natural Origin" |  |

**Appendix B**

| 10. | Argan Oil | "Certified Pure*plants*"  "Aloe & Camelia"  "96% Natural Origin" |   DEEP HAIR NOURISHMENT: Get deeply nourished, weightlessly soft hair with shampoo and conditioner containing naturally derived camellia oil  SUPRISINGLY LIGHTWEIGHT: Camellia oil mimics the hair's natural oils, so it instantly soaks in  REPAIR: Shampoo and conditioner made with argan oil help repair damage for silky soft hair  FREE OF PARABENS, DYES, AND PHTHALATES: Plus, Certified PETA Cruelty-Free  REAL, PURE INGREDIENTS: Our plants are certified by the Royal Botanic Gardens, Kew  96% NATURAL ORIGIN INGREDIENTS: Natural source ingredients with limited processing and purified water. After processing, natural source ingredients maintain ≥50% of their natural origin material  DUAL PACK: This set contains one 13.5oz bottle of shampoo and one 13.5oz bottle of conditioner  Ingredients/ingrédients:  Shampoo: Water, Sodium Lauryl Sulfate, Cocamidopropyl Betaine, Glycol Distearate, Fragrance, Camellia Oleifera Seed Oil, Aloe Barbadensis Leaf Juice, Argania Spinosa Kernel Oil, Histidine, Sodium Citrate, Sodium Xylenesulfonate, Sodium Chloride, Sodium Benzoate, Dimethiconol, Dimethicone, Sodium Salicylate, Guar Hydroxypropyltrimonium Chloride, Citric Acid, Tetrasodium EDTA, TEA-Dodecylbenzenesulfonate, Trideceth-10, Benzyl Alcohol  Conditioner: Ingredients/ingrédients: Stearyl Alcohol, Behentrimonium Methosulfate, Camellia Oleifera Seed Oil, Aloe Barbadensis Leaf Juice, Argania Spinosa Kernel Oil, Histidine, Cetyl Alcohol, Fragrance, Bis-Aminopropyl Dimethicone, Benzyl Alcohol, Dicetyldimonium Chloride, Oleic Acid, Sodium Benzoate, Disodium EDTA, Citric Acid |

**Appendix B**

| 11. | Sulfate-Free Honey | "Certified Pure*plants*"<br><br>"Honey"<br><br>"96% Natural Origin" |  |
|---|---|---|---|



| Features | Description | Ingredients | How to Use |
|---|---|---|---|

DEEP HAIR NOURISHMENT: Get deeply nourished, weightlessly soft hair with shampoo and conditioner containing naturally derived camellia oil

SUPRISINGLY LIGHTWEIGHT: Camellia oil mimics the hair's natural oils, so it instantly soaks in

DAILY MOISTURE: Shampoo and conditioner made with luscious honey provide everyday hydration for touchably soft hair

FREE OF SULFATES, PARABENS, DYES, AND PHTHALATES: Plus, Certified PETA Cruelty-Free

REAL, PURE INGREDIENTS: Our plants are certified by the Royal Botanic Gardens, Kew

96% NATURAL ORIGIN INGREDIENTS: Natural source ingredients with limited processing and purified water. After processing, natural source ingredients maintain ≥50% of their natural origin material

DUAL PACK: This set contains one 13.5oz bottle of shampoo and one 13.5oz bottle of conditioner

Ingredients/ingrédients:

Shampoo: Water, Sodium Cocoyl Isethionate, Lauramidopropyl Betaine, Cocamidopropyl Betaine, Sodium Lauroyl Sarcosinate, Fragrance, Camellia Oleifera Seed Oil, Aloe Barbadensis Leaf Juice, Honey Extract, Histidine, Sodium Benzoate, Polyquaternium-10, Sodium Salicylate, Sodium Citrate, Citric Acid, Tetrasodium EDTA

Conditioner: Water, Stearyl Alcohol, Behentrimonium Chloride, Bis-Aminopropyl Dimethicone, Cetyl Alcohol, Camellia Oleifera Seed Oil, Aloe Barbadensis Leaf Juice, Honey Extract, Histidine, Fragrance, Phenoxyethanol, Benzyl Alcohol, Sodium Benzoate, Disodium EDTA, Citric Acid, Polysorbate 20.

**Appendix B**

| 12. | Sulfate-Free Hemp Oil | "Certified Pure*plants*"<br><br>"Hemp Oil"<br><br>"97% Natural Origin" |  |
|---|---|---|---|



DEEP HAIR NOURISHMENT: Get deeply nourished, weightlessly soft hair with shampoo and conditioner containing naturally derived camellia oil

SUPRISINGLY LIGHTWEIGHT: Camellia oil mimics the hair's natural oils, so it instantly soaks in

FRIZZ CONTROL: Shampoo and conditioner made with hemp oil help reduce frizz for lusciously soft hair

FREE OF SULFATES, PARABENS, DYES, AND PHTHALATES: Plus, Certified PETA Cruelty-Free

REAL, PURE INGREDIENTS: Our plants are certified by the Royal Botanic Gardens, Kew

96% NATURAL ORIGIN INGREDIENTS: Natural source ingredients with limited processing and purified water. After processing, natural source ingredients maintain ≥50% of their natural origin material

DUAL PACK: This set contains one 13.5oz bottle of shampoo and one 13.5oz bottle of conditioner

Ingredients/ingrédients:

Shampoo: Water, Sodium Cocoyl Isethionate, Lauramidopropyl Betaine, Cocamidopropyl Betaine, Sodium Lauroyl Sarcosinate, Fragrance, Camellia Oleifera Seed Oil, Aloe Barbadensis Leaf Juice, Cannabis Sativa Seed Oil, Histidine, Sodium Benzoate, Sodium Salicylate, Dimethiconol, Polyquaternium-10, Sodium Citrate, Citric Acid, Tetrasodium EDTA

Conditioner: Water, Stearyl Alcohol, Behentrimonium Chloride, Cetyl Alcohol, Bis-Aminopropyl Dimethicone, Camellia Oleifera Seed Oil, Aloe Barbadensis Leaf Juice, Cannabis Sativa Seed Oil, Histidine, Fragrance, Phenoxyethanol, Benzyl Alcohol, Sodium Benzoate, Disodium EDTA, Polysorbate 20, Citric Acid

<u>**Appendix B**</u>

| **Pantene Essential Botanicals** | | | |
|---|---|---|---|
| 13. | White Tea & Cucumber Shampoo | "Volumizing Shampoo"<br><br>"90% Naturally Derived* Ingredients" |  |

**Appendix B**

| 14. | Apricot & Shea Butter Shampoo | "Moisturizing Shampoo"<br><br>"96% Naturally Derived* Ingredients"<br><br>"Sulfate Free" |  |

**Appendix B**

| 15. | Passion Fruit & Cocoa Butter Shampoo/Conditioner | "Color Safe Moisturizing Shampoo"<br><br>"90% Naturally Derived* Ingredients" (Shampoo)<br><br>"96% Naturally Derived* Ingredients" (Conditioner) |   <br><br>**ESSENTIAL BOTANICALS MOISTURIZING SHAMPOO WITH PASSION FRUIT & COCOA BUTTER**<br><br>★★★★★  5.0 (2)   WRITE A REVIEW<br><br>Get moisturized, great smelling hair with Pantene Pro-V Essential Botanicals Shampoo. This nourishing formula contains Active Pro-V Nutrients that absorb deeply into hair to nourish each strand inside and out, leaving you with softer* hair & a healthy shine.<br><br>The Essential Botanicals Shampoo is made with 90% naturally derived** ingredients. Together, the Essential Botanicals Moisturizing Shampoo and Conditioner system helps protect from color fade.<br><br>*vs. non-conditioning shampoo<br>**Natural source ingredients with limited processing & purified water create this 90% natural origin shampoo/conditioner. After processing, natural source ingredients maintain ≥ 50% of their natural origin material.<br><br>INGREDIENTS<br><br>Water, Sodium Lauryl Sulfate, Sodium Laureth Sulfate, Cocamidopropyl Betaine, Glycol Distearate, Fragrance, Citrus Limon (Lemon) Peel Oil, Sodium Citrate, Cocamide MEA, Sodium Xylenesulfonate, Dimethicone, odium Chloride, Citric Acid, Panthenol, Sodium Benzoate, Tetrasodium EDTA, Guar Hydroxypropyltrimonium Chloride, Polyquaternium-6, Panthenyl Ethyl Ether, Histidine, Passiflora Edulis Fruit Extract, Theobroma Cacao (Cocoa) Seed Butter, Methylchloroisothiazolinone, Methylisothiazolinone |

## Appendix B

| 16. | Crisp Apple & Honeysuckle Shampoo | "Volumizing Shampoo"  "96% Naturally Derived* Ingredients" |  |