UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORAINE MCWHORTER, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>THE PROCTER & GAMBLE COMPANY,<br><br>　　　　　Defendant. | Case No. 24-cv-00806-AMO<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**<br><br>Re: Dkt. No. 17 |

　　　　Defendant The Procter & Gamble Company's ("P&G") motion to dismiss was heard before this Court on November 7, 2024. Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority, the Court hereby **GRANTS** P&G's motion, for the following reasons.

**I.　　BACKGROUND**

　　　　This case arises from P&G's advertising statements that certain of its shampoos and conditioners are comprised of specific proportions of "natural origin ingredients" (e.g., "90% Natural Origin* ingredients") or "naturally-derived ingredients (e.g., "97% Naturally Derived** Ingredients"). Compl. ¶ 2.

　　　　**A.　　P&G's Pantene and Herbal Essences Shampoos and Conditioners**

　　　　The challenged products include, but are not limited to, shampoos and conditioners P&G sells under three brand names: Herbal Essences "Real Botanicals," Herbal Essences "Certified PurePlants," and Pantene "Essential Botanicals." Compl. ¶¶ 2, 28. The front label of each Pantene and Herbal Essences product at issue in this case (the "Products") state that a certain percentage of the product is made from "naturally derived ingredients" or is of "natural origin." See Compl. ¶¶ 29-30, 34-35, 41 (collectively, the "Natural Origin Claims"). The back panel of

every shampoo and conditioner bearing Natural Origin Claims includes text that provides P&G's definition of "naturally derived" or "natural origin." *Id.* Plaintiffs' claims all rely on the Products' labeling, and the Complaint and Appendix extensively quote and include images of the Products' front and back labels.

There are generally three different ways in which the Natural Origin Claims are presented to consumers. First, the front label of Pantene Apricot & Shea Butter Conditioner and similar products states "96% Naturally Derived$^{**}$ Ingredients." Compl. App'x B at 59. The back label explains what P&G means by the front-label statement: "$^{**}$Natural source ingredients with limited processing and purified water create this 96% natural origin shampoo. After processing, natural source ingredients maintain ≥ 50% of their natural origin material." Compl. ¶¶ 44-45. Asterisks connect the claim and explanatory text. Other Pantene Products have the same type of labeling. *See* Compl. App'x B at 58-61.

Second, the front label of Herbal Essences Argan Oil Shampoo and other products like it includes the phrase "90% Natural Origin." Compl. ¶ 34. The back label includes the same phrase: "90% Natural Origin$^{*}$." Directly below on the back label, P&G explains what it means by "% natural origin": "$^{*}$Natural source ingredients with limited processing and purified water. After processing, natural source ingredients maintain ≥ 50% of their natural origin material." Compl. ¶¶ 36-37. Again, the asterisks connect the claim and its explanatory text. Certain other versions of Herbal Essences products, such as the White Grapefruit & Mint Shampoo and the Coconut Oil Conditioner, have similar labels. *See* Compl. App'x B at 48, 54.

Third and finally, the front label of Herbal Essences White Grapefruit & Mint Conditioner also says "90% Natural Origin." Compl. App'x B at 48. The back label incorporates the explanation of what "90% natural origin" means into the product description at the top of the label: "Since 1971, we've believed in bringing the beauty & experience of nature to your hair. Now we've partnered with Royal Botanical Gardens, KEW, to endorse our real botanicals. It is combined with natural source ingredient materials with limited processing & purified water to create this 90% natural origin conditioner." Compl. ¶ 38 & App'x B at 48. Other Herbal Essences

2

Products, such as the Coconut Milk Shampoo and Conditioner and the Golden Moringa Oil Shampoo and Conditioner, have similar labels. *See* Compl. App'x B at 46, 47, 49, 50, 52, 53.

### B. Plaintiffs' Allegations

Plaintiff Loraine McWhorter purchased Herbal Essences Argan Oil Shampoo and Herbal Essences White Charcoal Conditioner from a Walmart "beginning in November 2022." Compl. ¶ 83. Plaintiff Sameer Sharma purchased Pantene Apricot & Aloe Vera Shampoo and Conditioner from a Walmart around November 11, 2023. Compl. ¶ 88. Plaintiffs assert that, contrary to P&G's statements, aside from water, natural oils, and natural fragrances, none of the ingredients are "natural source ingredients," nor made or derived using "limited processing." Compl. ¶¶ 51-56. By defining "natural source ingredients" as those which "maintain ≥50% of their natural origin material" after processing, P&G obfuscates the fact that these "natural source ingredients" are actually man-made chemicals, synthesized using industrial chemical processes. Compl. ¶¶ 52-82. Neither Plaintiff appears to have read the explanations of the Natural Origin Claims that appear on each product they purchased: McWhorter does not mention the explanations at all, *see* Compl. ¶¶ 83-87, while Sharma alleges that he "overlooked the asterisks and associated statement due to their small size," *id.*, ¶ 91. Plaintiffs do not allege that they performed any analysis or testing of the Products before filing their Complaint.

Plaintiffs advance that the Products' labels mislead consumers in several different ways. First, Plaintiffs claim that they understood the Natural Origin Claims to mean "that the product was comprised of ingredients of which [90 or 96]% were natural origin." Compl. ¶¶ 84, 89. This theory is based solely on the number of ingredients in each product. If a given shampoo is represented to be 96% natural origin and lists 20 ingredients, for example, Plaintiffs contend a reasonable consumer would believe that at least 19 of the ingredients were natural origin, no matter how much of each ingredient is present in the product. Plaintiffs allege they would not

have purchased or would have paid less for the Products had P&G "adequately disclosed the number of ingredients that were naturally derived." Compl. ¶¶ 85, 90.[1]

Second, Plaintiffs assert that if the Natural Origin Claims are instead based on the composition of each product as a whole by weight, the claims are literally false if water is excluded from the analysis, because in that case "over 90% of the ingredients in the Products are not natural and do not originate in nature; rather, they are of industrial-origin." Compl. ¶ 5.

Third, they allege that a consumer may interpret the Product labels to state that a certain percentage of the Products were "extracted directly from plants" or "exclude industrial chemical modifications," both of which would still render the natural origin percentage statements false. Compl. ¶¶ 9, 55.

Finally, Plaintiffs allege "upon information and belief" that even if the Natural Origin Claims are based on composition by weight and water is included, "the claim is not true." Compl. ¶¶ 5, 57.

Based on these allegations, Plaintiffs bring a putative class action in which they seek to represent the following class: "All persons in [sic] who purchased, in the State of California, the Products from February 9, 2024 to the present." Compl. ¶ 93. Although the Complaint makes passing references to a subclass, it does not define one. *See* Compl. ¶¶ 93-99. The Complaint seeks relief under the Consumers Legal Remedies Act ("CLRA"); Unfair Competition Law ("UCL"); False Advertising Law ("FAL"); common law fraud, deceit, and/or misrepresentation; and negligent misrepresentation. Compl. ¶¶ 101-150.

## II.  DISCUSSION

P&G moves to dismiss on two Rule 12 bases: failure to state a claim and lack of standing. Because the Court dismisses the claims as legally insufficient, it does not reach P&G's attacks on Plaintiffs' standing for products they did not purchase or to pursue equitable relief.

---

[1] At the hearing, Plaintiffs clarified that they do not intend to proceed on a theory that P&G's Natural Origin Claims were false if water is excluded from the calculation. Rather, Plaintiffs contend that, even if water is excluded, the majority of what remains are non-natural chemicals.

4

**A. Legal Standard**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Under Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), a complaint may be dismissed under Rule 12(b)(6) if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).

While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 558-59 (2007) (citations and quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Id.* at 679.

Review is generally limited to the contents of the complaint, although the court can also consider a document on which the complaint relies if the document is central to the claims asserted in the complaint, and no party questions the authenticity of the document. *See Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). The court may consider matters that are properly the subject of judicial notice, *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001), and may also consider documents referenced extensively in the complaint and documents that form the basis of the plaintiffs' claims. *See No. 84 Emp'r-Teamster Jt. Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 925 n.2 (9th Cir. 2003).

Plaintiffs' claims that sound in fraud must also meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th

Cir. 2009). Rule 9(b) requires a party alleging fraud or mistake to state with particularity the circumstances constituting fraud or mistake. To satisfy this standard, the "complaint must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (citation and internal quotation marks omitted). If dismissal is warranted, it is generally without prejudice, unless it is clear that the complaint cannot be saved by any amendment. *Sparling v. Daou*, 411 F.3d 1006, 1013 (9th Cir. 2005).

### B.     Analysis

The Court discusses in turn (1) whether the doctrine of judicial estoppel precludes P&G's arguments in this case, (2) the sufficiency of Plaintiffs' allegations under the "reasonable consumer" standard, (3) the sufficiency of allegations related to P&G's purported omission of material from the labels, (4) the sufficiency of allegations regarding Plaintiffs' claim for negligent misrepresentation, and (5) the sufficiency of allegations regarding Plaintiffs' claim for fraud.

#### 1.     Judicial Estoppel

Plaintiffs argue that P&G's motion to dismiss should fail on the basis that the company is judicially estopped from taking positions here that are contrary to the positions it took in another product labeling case. *See* Opp. at 11-12. The doctrine of judicial estoppel "precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). It is designed to "protect against a litigant playing fast and loose with the courts." *Id.* Thus, "a party is estopped from making an argument [in a later case] when 1) its current position is clearly inconsistent with its previous position; 2) the party has succeeded in persuading a court to accept that party's earlier position; and 3) the party, if not estopped, would derive an unfair advantage or impose an unfair detriment on the opposing party." *Perez v. Discover Bank*, 74 F.4th 1003, 1008 (9th Cir. 2023). It applies not only "in the same litigation, but is also appropriate to bar litigants from making incompatible statements in two different cases." *Hamilton*, 270 F.3d at 783.

6

1    Plaintiffs aver that P&G takes positions about what constitutes a synthetic ingredient that
2 are inconsistent with the positions it took on these issues in *McGinity v. Procter & Gamble Co.*, 69
3 F.4th 1093, 1099 (9th Cir. 2023). In *McGinty*, P&G took the position that false claims about the
4 proportion of natural ingredients in a different shampoo product, Nature Fusion, would be
5 unambiguous affirmative misrepresentations subject to *Gerber*'s rule that with "an affirmative
6 misrepresentation, revealing the deception in the fine print on the back of the box does not cure
7 that misrepresentation." RJN Ex. 2 (P&G Ans. Br. in *McGinity*) at 44 (citing *Williams v. Gerber
8 Prods. Co.*, 552 F.3d 934, 938-40 (9th Cir. 2008)). P&G argued in *McGinity* that *Gerber* did not
9 apply, because "nothing about the front of the [NatureFusion] label makes any affirmative
10 representations about what ingredients or what proportion of ingredients are in it and whether they
11 are natural or synthetic." RJN Ex. 3 (*McGinity* Hr'g Tr.) at 24. Here, by contrast, P&G argues
12 that its claims that certain proportions of its Products' ingredients are naturally derived/natural
13 origin shows "only that the front label may contain an ambiguity" about how that proportion is
14 calculated, such "that the back labels must be considered." Mot. at 10-11. Moreover, in
15 *McGinity*, P&G also identified as non-natural most of the ingredients in the Products here (the
16 "Common Ingredients") which it now contends are "naturally derived." Compl. ¶ 77. In
17 Plaintiffs' view, in this case, P&G improperly argues that the same ingredients it presented as
18 synthetic in *McGinity* are suddenly "naturally-derived."
19    P&G counters that it did not make any such factual concessions regarding the synthetic
20 nature of the ingredients in *McGinity*; rather, it accepted as true the plaintiff's allegations that
21 certain ingredients were synthetic, as it must on a motion to dismiss, and argued that plaintiff still
22 failed to state a claim. Reply at 10. P&G similarly accepted the facts as pleaded on appeal, as it
23 was required to do. For example, in its answering brief, P&G explained that the ingredient list
24 "also includes ingredients . . . that McGinity alleges 'are not "natural" ingredients . . . .' " RJN
25 Ex. 2 at 19; *id.* at 30 ("the back contains a complete ingredient list that includes ingredients
26 McGinity deems synthetic, as well as natural ones"). The Court finds that P&G's appellate
27 advocacy did not make a factual concession that carries preclusive effect into this case.
28

United States District Court
Northern District of California

1    Even if the Court were to credit Plaintiffs' argument that P&G conceded certain
2 ingredients were "synthetic" in *McGinity*, that still would not establish a "clearly inconsistent
3 position," as required for judicial estoppel. As discussed more fully below, the terms "naturally
4 derived" and "natural origin" do not mean the same thing as "natural." An ingredient that
5 Plaintiffs deem "synthetic" may still properly be characterized as "naturally derived" or of
6 "natural origin" under the explanations on the Products' back labels. Because the arguments are
7 not inconsistent, there is no need to reach whether the Ninth Circuit relied on those arguments or if
8 P&G here derives an unfair advantage from its positions in contrast to those it took in *McGinity*.
9 Judicial estoppel does not function to bar P&G's arguments here.

### 2. Reasonable Consumer Standard

P&G argues that Plaintiffs' California statutory claims fail because none of the theories advanced demonstrate that a reasonable consumer would find the Product labels false or misleading. To protect its citizens from unfair, deceptive, or fraudulent business practices, California has enacted a number of consumer protection statutes. The CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any customer." Cal. Civ. Code § 1770(a). Similarly, the UCL prohibits any "unlawful, unfair or fraudulent business act or practice," and the FAL prohibits any "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code §§ 17200, 17500. These claims are all governed by the "reasonable consumer" test. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

"Under the consumer protection laws of California[,] . . . claims based on deceptive or misleading marketing must demonstrate that a 'reasonable consumer' is likely to be misled by the representation." *Moore v. Trader Joe's Co.*, 4 F.4th 874, 881 (9th Cir. 2021); accord *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1360 (2003). "The California Supreme Court has recognized that these laws prohibit not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Id.* at 938 (internal quotation marks omitted) (quoting *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002)). The reasonable consumer test requires

8

more than a mere possibility that defendant's product "might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner." *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003). Rather, the test requires a probability "that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id.*; *see also Moore*, 4 F.4th at 881. Relevant here, courts have held that claims of "100% naturally-derived" are plausibly deceptive when the products contain any synthetic ingredients. *Gregorio v. Clorox Co.*, No. 17-CV-03824-PJH, 2018 WL 732673, at *4 (N.D. Cal. Feb. 6, 2018).

Generally, "whether a reasonable consumer would be deceived . . . [is] a question of fact not amenable to determination on a motion to dismiss." *Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188, 1193 (N.D. Cal. 2014); *see Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015). "However, in rare situations a court may determine, as a matter of law, that the alleged violations of the UCL, FAL, and CLRA are simply not plausible." *Ham*, 70 F. Supp. 3d at 1193.

In *Williams*, the Ninth Circuit determined that a reasonable consumer could be deceived by images on a fruit snack label depicting a number of different fruits, "potentially suggesting (falsely) that those fruits or their juices are contained in the product." *Williams*, 552 F.3d at 939. The appellate panel rejected the argument that a misrepresentation on the front of the package could be cured by a disclaimer on the back of the package, instead concluding "reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the package." *Id.* at 939-40.

Since *Williams*, the Ninth Circuit has further clarified that, when a front label is ambiguous rather than unambiguously deceptive, "the ambiguity can be resolved by reference to the back label." *McGinity*, 69 F.4th at 1099. In *McGinity*, the plaintiff alleged that the packaging of "Pantene Pro-V Nature Fusion" shampoo and conditioner products was deceptive because the label suggested the products "are natural, when, in fact, they contain non-natural and synthetic ingredients." *Id.* at 1096. As a result, the Ninth Circuit considered the back label, and it observed that mentions of avocado oil, together with an ingredient list that contained synthetic ingredients, clarified that "Nature Fusion" referred to a mix of natural and synthetic ingredients. *Id.* at 1099.

9

1  Building on *McGinity*, the Ninth Circuit explained that "a front label is ambiguous when
2  reasonable consumers would necessarily require more information before reasonably concluding
3  that the label is making a particular representation" and that this ambiguity triggers a consumer's
4  obligation to search a back label. *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 781 (9th Cir.
5  2024).
6       Here, the weight of this authority leads to the conclusion that the Natural Origin Claims are
7  ambiguous such that a reasonable consumer must review the back label for additional information
8  about the meaning of the Natural Origin Claims. *See* Compl. ¶¶ 29-30, 34-35, 41. The Products'
9  front labels state that a certain percentage of the product – less than 100 percent – is made from
10 "naturally derived ingredients" or is of "natural origin." *Id.* The labels' provision of a percentage,
11 combined with "naturally derived" or "natural origin," communicates to the consumer that the
12 product is not all natural or at least raises enough ambiguity that the consumer must review the
13 back label for more information about the product composition. As in *McGinity* and *Whiteside*, a
14 reasonable consumer would need more information to understand the meaning of such claims.[2]
15 Like in *McGinity*, the front label Natural Origin claims represent "that something about the
16 product bears a relationship to nature," but did "not promise that the product is wholly natural,"
17 unlike a "label declaring that a product is '100% natural' or 'all natural.' " *Id.*, 69 F.4th at 1098.
18      Plaintiffs' theory about the misleading nature of the Natural Origin Claims at issue thus
19 hinges on a sleight of hand: that "naturally derived ingredients" and "natural origin" are somehow
20 "effectively identical" to "natural." *See* Opp. at 8. But that is not what the labels say, and
21 Plaintiffs are not free to excise or ignore words on the label to manufacture customer confusion.
22 As the Ninth Circuit explained in *Whiteside*, "the presence of an asterisk alone puts a consumer on
23 notice that there are qualifications or caveats, making it unreasonable to assume" that "naturally

---

[2] The presence of asterisks on several of the product labels only reinforces the reasonableness of referring to the back label for definitions of front label statements on these Products. *See Moreno v. Vi-Jon, Inc.*, 2021 WL 807683, at *6 (S.D. Cal. Mar. 3, 2021) ("Plaintiff cannot simply look to the statement on the front panel, ignore the asterisk, and claim [she] has been misled."); *see also Dinan v. SanDisk LLC*, No. 18-CV-05420-BLF, 2020 WL 364277, at *8 (N.D. Cal. Jan. 22, 2020) ("Asterisks are common in both commerce and elsewhere to denote that the 'reader' should be aware that there is more than meets the eye." (citation omitted).

derived" and "natural origin" are "effectively identical" to "natural." *Whiteside*, 108 F.4th at 785. The asterisks present on the labels here signal to a reasonable consumer that they must look to other parts of the product label to understand the full explanation of the label's statements. And because the back label sufficiently explains what P&G means by the front label's claim that a certain percentage of the product is made of "naturally derived ingredients" or is of "natural origin," Plaintiffs fail to establish that the product labels were false or misleading. *See, e.g.*, Compl. ¶ 47 ("**Natural source ingredients with limited processing & purified water create this 90% natural origin shampoo/conditioner. After processing, natural source materials maintain ≥ 50% of their natural origin material").

Attempting to resist consideration of the back label, Plaintiffs contend that the Natural Origin Claims are unambiguously deceptive because courts have held that claims like "100% natural" or "all natural" plausibly exclude any synthetic ingredients. Opp. at 7-8. But the product labels here do not make those claims; they claim that some specific percentage of the Product (e.g., 90%) is made from "naturally derived ingredients" or is of "natural origin" and then proceed to define those terms elsewhere on the label. Plaintiffs' reliance on a supposed "mountain of precedent" interpreting the phrases "100% natural" or "all natural" is unhelpful, as it reads the words "derived" and "origin," as well as the qualified percentage, out of the labels at issue. A reasonable consumer may not ignore the labels' actual wording or substitute another claim that the Product labels never made. *See Moreno v. Vi-Jon, Inc.*, 2021 WL 807683, at *6. None of Plaintiffs' proposed interpretations render the Natural Origin Claims false – whether Plaintiffs interpret the Natural Origin Claims to be based on weight, volume, the number of ingredients, the percentage "extracted directly from plants," or the percentage excluding "industrial chemical modifications," the labels explain what P&G means by the front-label percentage statements. Compl. ¶¶ 44-45 ("**Natural source ingredients with limited processing and purified water create this 96% natural origin shampoo. After processing, natural source ingredients maintain ≥ 50% of their natural origin material."). Where the label expressly defines a claim, Plaintiffs cannot ignore that definition in favor of their own preferred interpretation. *Mier v. CVS Pharmacy, Inc.*, 2024 WL 121880, at *8 (C.D. Cal. Jan. 10, 2024) (dismissing a claim because plaintiffs'

11

"misunderstanding of the label only makes sense if the Court or a consumer were to ignore the statement on the back label. Under *McGinity*, however, the Court cannot do so."); *see also McGinity*, 69 F.4th at 1098.

In sum, the Court concludes that members of the consuming public are unlikely to be deceived by any affirmative representations on the packaging of P&G's Products. Because consumers may not introduce their own interpretation of a statement on a product label by selectively reviewing a portion of a label to the exclusion of the same label's clarification of the statement, Plaintiffs' claims fail the reasonable consumer test as a matter of law.

### 3. Omission

The Complaint includes a handful of glancing references to purported omissions made by P&G. *See* Compl. ¶¶ 10, 102, 110, 114, 125, 134, 142. The Court briefly considers whether Plaintiffs' claims survive under this alternate theory of liability. "[T]o be actionable [an] omission must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861 (9th Cir. 2018). "Under California law, a duty to disclose arises in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from plaintiff; or (4) when the defendant makes partial representations but also suppresses some material facts." *Barrett v. Apple Inc.*, 523 F. Supp. 3d 1132, 1149 (N.D. Cal. 2021) (quoting *In re Apple In-App Purchase Litig.*, 855 F. Supp. 2d 1030, 1039 (N.D. Cal. 2012)).

Plaintiffs allege no facts that would establish P&G's duty to disclose. This alone warrants dismissal of the omission claim. *See Barrett*, 523 F. Supp. 3d at 1149. Further, Plaintiffs fail to identify an actionable omission. Plaintiffs argue that they have stated actionable omissions in the form of the details of how P&G calculated the claimed proportions of "naturally-derived"/"natural origin" ingredients, including the fractions of the synthetic ingredients it claims to be natural in origin or derivation, the basis for its conclusion each ingredient was natural origin/derived, and how those fractions add together to create the cumulative proportion posted on the front of each Products' labels. *See* Opp. at 22. However, Plaintiffs do not point to any portion of the Complaint

in which they identify such an omission. Any claim of consumer fraud based on a theory of omission therefore fails.

### 4. Negligent Misrepresentation

P&G further argues Plaintiffs' negligent misrepresentation claim is barred because Plaintiffs' only damage was economic. Mot. at 20-21. Despite Plaintiffs' arguments to the contrary, they here fail to state an independent basis for their damages apart from their economic loss. The California Supreme Court describes, "In general, there is no recovery in tort for negligently inflicted 'purely economic losses,' meaning financial harm unaccompanied by physical or property damage. . . [T]he rule functions to bar claims in negligence for pure economic losses in deference to a contract between litigating parties." *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 922 (2022) (citation omitted). "Not all tort claims for monetary losses between contractual parties are barred by the economic loss rule. But such claims are barred when they arise from – or are not independent of – the parties' underlying contracts." *Sheen*, 12 Cal. 5th at 923. California courts reason that "the economic loss rule prevents the law of contract and the law of tort from dissolving into one another" and "requires a [plaintiff] to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004) (brackets and internal quotation marks omitted); *see also J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803 (1979) (describing the economic loss rule).

Plaintiffs aver that claims for negligent misrepresentation constitute a species of fraud for which economic loss is recoverable, citing an unpublished Ninth Circuit disposition. *See* Opp. at 21 (citing *Kalitta Air, L.L.C. v. Cent. Texas Airborne Sys., Inc.*, 315 F.App'x 603, 607 (9th Cir. 2008) ("California law classifies negligent misrepresentation as a species of fraud for which economic loss is recoverable.")). However, more recently, and following more in-depth analysis of the economic loss rule, courts in this district have held that a "negligent misrepresentation claim [does not] fall within the category of intentional misrepresentation claims that the California Supreme Court has held are not barred" by the economic loss rule. *See Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 689 (N.D. Cal. 2021). Plaintiffs cannot avoid the overall rule that "requires a

13

purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Swearingen v. Santa Cruz Natural, Inc.*, No. CV 13-4291-SI, 2016 WL 4382544, at *10 (N.D. Cal. Aug. 17, 2016) (quoting *Robinson Helicopter*, 34 Cal. 4th at 988). The Court accordingly DISMISSES Plaintiffs' claim for negligent misrepresentation under the economic loss rule.

### 5. Fraud

To state a fraud claim, Plaintiffs must establish a misrepresentation, and they must allege that P&G knew the misrepresentation was false at the time it was made. *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (1996). Plaintiffs aver they sufficiently allege that P&G knowingly misrepresented the Natural Origin Claims, as the Complaint alleges not only that P&G has knowingly adopted the British Standards Institute's ISO 16128: "Guidelines on technical definitions and criteria for natural and organic cosmetic ingredients and products" standard to denote the proportion of "natural origin"/"naturally-derived ingredients," but also that the ISO 16128 standard was not designed for consumer advertising or labelling. Compl. ¶¶ 7, 59, 63. Plaintiffs contend that "P&G knows or should know that its claims are false and/or misleading, because the BSI explicitly stated in the ISO 16128 publication that 'Neither ISO 16128-1 nor this document [i.e., ISO 16128-2] addresses product communication (e.g. claims and labelling), . . . characteristics of packaging materials or regulatory requirements applicable for cosmetics.'" Compl. ¶ 79. But a disclaimer that a document does not address regulatory requirements does not mean that P&G knowingly misrepresented any of its marketing statements, as Plaintiffs suggest. Plaintiffs specifically assert that the use of the ISO 16128 standard is "inherently problematic," but this still does not adequately allege the falsity of any of P&G's product labels, much less P&G's knowing falsity of any such representations. Plaintiffs' fraud claim fails on this basis, and the Court accordingly DISMISSES the fraud claim.

### C. Leave to Amend

"Generally, Rule 15 advises the court that leave shall be freely given when justice so requires. This policy is to be applied with extreme liberality." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (internal quotations and citations omitted). Courts may

14

deny leave to amend "only if there is strong evidence of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment, etc." *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (modification in original).

The futility of amendment factor weighs in favor of denying leave to amend where "no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim[.]" *See Ross v. AT&T Mobility, LLC*, No. 19-CV-06669-JST, 2020 WL 9848733, at *4 (N.D. Cal. Dec. 18, 2020) (citations omitted). That is the case here. The Court asked counsel for Plaintiffs at the hearing whether any additional facts could be added to bolster these claims, and counsel conceded that no additional facts would support the claims if the Court determined that the plain language of the product labels would not plausibly deceive a reasonable consumer. *See* Hr'g Tr. (ECF 38) at 8-11, 17-18, 22-23. Though Counsel subsequently requested leave to amend (ECF 37), the Court finds counsel's initial assessment of the claims most accurate – given the legal conclusions drawn, no additional facts could be pleaded to establish the theories of misrepresentation advanced by Plaintiffs.

As discussed above, Plaintiffs' claims fail the reasonable consumer test as a matter of law. Even if Plaintiffs' claims of consumer fraud are considered under a theory of omission, they too fail where Plaintiffs fail to establish a relationship giving rise to duty to disclose under California law. Plaintiffs' claim for negligent misrepresentation also fails as a matter of law because it is barred by the economic loss rule. Finally, Plaintiffs fail to establish fraud on the part of P&G where Plaintiffs cannot establish a knowing misrepresentation in its reference to an objective standard. None of these claims could be saved by the addition of factual allegations. Accordingly, the Court determines that further amendment would be futile, and thus exercises its discretion to deny leave to amend. *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008).

//

//

### III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** P&G's motion to dismiss for failure to state a claim. Because Plaintiffs' claims fail as a matter of law, the Court **DISMISSES** the claims with prejudice.

**IT IS SO ORDERED.**

Dated: March 28, 2025

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**